# In the United States Court of Federal Claims

No. 24-810

Filed: April 30, 2025

---

**APRIL HARRY N. QUINONES and JANETH R. QUINONES,**

        *Plaintiffs*,

v.

**THE UNITED STATES,**

        *Defendant*.

---

*April Harry N. Quinones* and *Janeth R. Quinones*, Pembroke Pines, FL, Pro se.

*Elizabeth B. Villareal*, Attorney of Record, with *Melissa A. Hammer*, Trial Attorney, Tax Division, Court of Federal Claims Section, and *Christopher J. Williamson*, Assistant Chief, U.S. Department of Justice, Washington DC, for Defendant.

## POST-TRIAL MEMORANDUM OPINION AND ORDER

      Pro se Plaintiffs April Harry N. Quinones ("Mr. Quinones") and Janeth R. Quinones ("Mrs. Quinones") seek $4,547,247 following the Internal Revenue Service's ("IRS") disallowance of their 2021 tax refund request. (*See* Compl. at 1, ECF No. 1). This claim, and its supporting documents submitted to the Court were fraudulent. In sum, Mr. and Mrs. Quinones's dupery involved imaginary numbers blatantly inserted into their joint tax return to obtain an undue refund. In doing so, and in filing their Complaint, the Plaintiffs actively attempted to defraud the Internal Revenue Service, the United States, and this Court. Accordingly, their claim is **FORFEITED** pursuant to 28 U.S.C. § 2514.

### I.      Findings of Fact

      The Plaintiffs alleged to the Court that the IRS violated: (1) I.R.C. § 31, which provides "the amount withheld as tax under chapter 24 shall be allowed to the recipient of the income as a credit against the tax imposed by this subtitle" and (2) I.R.C. § 37, which addresses overpayments of tax. (*See* Compl. at 2–6; I.R.C. §§ 31, 37 (West)). However, the United States

asserted an affirmative defense seeking forfeiture of this claim under the Special Plea in Fraud statute, 28 U.S.C. § 2514. (Def.'s Amended Answer, ECF No. 34).[1]

The only disputed issue here is whether the facts equate to fraud. The Plaintiffs jointly submitted their 2021 federal income tax return, reporting a total income of $14,433,860, $2,194,242 in federal income tax withheld, $785,775 in Social Security tax withheld, and $224,560 in Medicare tax withheld. (JX 2 at 1, 49, 51, ECF No. 7-2). Attached to their joint tax return were 2021 W-2 forms for both Mr. and Mrs. Quinones. (*See id.* at 49, 51). Mr. Quinones's 2021 W-2 was purportedly issued by his wholly owned company, Fur Systems, LLC. ((Trial Transcript ("Tr."), 40:25–41:15, ECF No. 48; *see* JX 2 at 49). Mr. Quinones is also Fur Systems' only employee. (Tr., 40:25–41:15). According to Mr. Quinones, Fur Systems makes "a net profit of around $8,000" per year. (*Id.*, 43:19–44:3). Mr. Quinones's 2021 W-2 reported $4,962,599 in wages, $766,832 in federal income tax withheld, $307,681 in Social Security tax withheld, and $71,958 in Medicare tax withheld. (JX 2 at 49; *see* Tr., 49:23–50:15).

Against the backdrop of these elevated claims, the real numbers were substantially less. Fur Systems, LLC *actually* paid Mr. Quinones $91,899.98 in wages, withheld $14,200.60 in federal income tax, $5,697.80 in Social Security tax, and $1,332.55 in Medicare tax. (JX 8; Tr., 45:11–24 (Def.'s Counsel: "Does [$91,899.98] accurately reflect the amount of wage income that Fur Systems paid you in 2021?" Mr. Quinones: "Yes, that's correct.")).

Mrs. Quinones also submitted a W-2 reporting wages of $9,471,261, federal income tax withheld of $1,427,408, Social Security tax withheld of $478,094, and Medicare tax withheld of $152,602. (JX 2 at 51; Tr., 49:20–51:3). Similar to her spouse's inflated inputs, Mrs. Quinones's employer Vistra Corporate Services ("Vistra Corp.") *actually* paid Mrs. Quinones $175,393.72, and withheld $26,433.49 in federal income tax, $8,853.60 in Social Security tax, and $2,825.96 in Medicare tax. (JX 7; Tr. 19:11–16, 48:2–4 (Def.'s Counsel: "Did [Mrs. Quinones] earn $175,393.72 in taxable wage income from Vistra Corp. in 2021?" Mr. Quinones: "Yes, that's correct.")). A summary of the Plaintiffs' actual and reported wages and withholdings is as follows:

|  | **Mrs. Quinones** | **Mr. Quinones** |
|---|---|---|
| **Actual Wages** | $175,393 | $91,899 |
| **Reported Wages** | $9,471,261 | $4,962,599 |
| **Actual Federal Income Tax** | $26,433 | $14,200 |
| **Reported Federal Income Tax** | $1,427,408 | $766,832 |
| **Actual Social Security Tax** | $8,853 | $5,697 |
| **Reported Social Security Tax** | $478,094 | $307,681 |
| **Actual Medicare Tax** | $2,825 | $1,332 |
| **Reported Medicare Tax** | $152,602 | $71,958 |

---

[1] The United States also asserted a counterclaim against the Quinones for $444,323.86 pursuant to I.R.C. § 7405, (ECF No. 17; *see also* United States' Amended Answer and Counterclaim, ECF No. 34) for the 2020 tax year. At the time this Opinion is filed, parties are in limited discovery pertaining to the United States' counterclaim, with a trial date to be determined. (*See* Countercl. Sched. Order, ECF No. 46). Accordingly, this decision is specific to Plaintiffs' original claim.

(*See* JX 2; JX 7; JX 8; Tr., 45:11–24, 48:2–4; 49:20–51:3).

At trial, Mrs. Quinones was shown her 2021 W-2 Form issued by Vistra Corp. and the 1040 she submitted to the IRS side-by-side. (Tr., 17:15; JX 2; JX 7). When asked about the enormous discrepancies, Mrs. Quinones deferred to her husband, who prepared their joint tax return. (Tr., 20:13). Mrs. Quinones stated that "intangibles," known only to her husband, accounted for the differences in the values. (*Id.*, 25:7–19). Questioned further, Ms. Quinones stated that "based on [Mr. Quinones's] explanation, those are items pertaining to like goodwill and notes[,]" (*id.*, 28:13–20), which are "financial jargon[,]" (Tr., 28:23), or "the value of your assets . . . that you would be able to value like a brand or the name of your brand, your profession. Those are like valuations that are not really cash or can be cash at this moment, but in the future[,]" (*id.*, 29: 2–8). Mrs. Quinones could not articulate a definition of her "brand" nor "goodwill" that would allow her to claim those values on her 2021 tax return. (*Id.*, 29:17–22). Ultimately, in both the submission of the 2021 tax documents at issue *and* the filing of the Complaint in this Court, Mrs. Quinones relied almost exclusively on her spouse's representations. (*Id.*, 34:14–25).

Mr. Quinones's testimony was equally opaque. Mr. Quinones's W-2, issued by Fur Systems, was created through an ADP software program based on information provided by Mr. Quinones. (Tr., 45:25–46:14). Mr. Quinones stated that the nearly $5 million in wages and over $1 million in withholdings on his W-2 included "intangibles and notes" like going concern value and goodwill. (*Id.*, 50:4–15). He also included these "intangibles and notes" in Mrs. Quinones's W-2 she reported to the IRS. (*Id.*, 50:18–51:3).

At trial, Mr. Quinones cited Section 197 of the Internal Revenue Code for the definition of going concern value. (Tr., 83:14–84:7). On the stand, Mr. Quinones read partly from 26 C.F.R. § 1.197-2:

> Going concern value is the additional value that attaches to property by reason of its existence as an integral part of an ongoing business activity. Going concern value includes the value attributable to the ability of a trade or business or part of a trade or business to continue functioning and generating income without interruption, notwithstanding a change in ownership or something.

(Tr., 83:20–84:4 (adding "or something" to 26 C.F.R. § 1.197-2)). While this section goes on to more specifically define the intangibles included in going concern value, Mr. Quinones did not include it in his testimony. (*See* 26 C.F.R. § 1.197-2). Mr. Quinones summarized his understanding of going concern value as "the ability for a property to function as itself." (Tr., 84:5–7). Mr. Quinones also cited I.R.C. § 1012 for the basis of his calculations of property value. (*Id.*, 84:25–85:5). While Mr. Quinones may have used the Internal Revenue Code as a jumping-off point in his understanding of tax law, the results were unrecognizably skewed definitions of going concern value, goodwill, and intangibles. Mr. Quinones could not point to any additional sources that he relied on to justify inflating his income and expenses. (*Id.*, 85:1–86:1).

3

At trial, the United States and the Court proposed a number of scenarios to attempt to understand Mr. Quinones's mathematical processes, including: medical and dental expenses; a hypothetical flu shot; and the purchase of a package of cookies. None were helpful.

First, the Court endeavored to understand the Plaintiffs' methodology using their claimed medical and dental expenses. Mr. Quinones reported spending $7,966,584 in "Medical and Dental Expenses" in 2021. (JX 2 at 26; Tr., 51:4–15). This number once again included "intangibles and notes" calculated by Mr. Quinones. (Tr., 51:14–15). In calculating these amounts, Mr. Quinones included the value of the medication or the services, and "considered it as income in exchange of the going concern value of the contract." (*Id.*, 52:8–14). Mr. Quinones did not report his out-of-pocket medical expenses, but rather the total cost of the services themselves. (*Id.*, 52:15–18). According to Mr. Quinones, Plaintiffs actually paid $15,965 for "services[,]" and approximately $1,000 for medications in 2021. (*Id.*, 100:22–25, 101:14–20). However, Mr. Quinones also then stated their total out-of-pocket medical expenses in 2021 were "around $1,700[.]" (*Id.*, 104:14–18). Even after these attempted explanations, exactly how the Plaintiffs arrived at nearly $8 million in medical and dental expenses reported to the IRS from their actual payment of an amount approximate to only 0.002 percent of the total claimed.

Second, explanations using a hypothetical flu shot fared no better. (Tr., 102:15–114:2). In this hypothetical, a $10 flu shot would result in Mr. Quinones adding another $10 representing "the value of the workforce that you paid for the service, plus the know-how of the service provider . . . who did the service[,]" and another $10 for the person who administered the vaccine. (*Id.*, 104:24–105:1, 105:11-17, 105:23–106:8, 106:14–107:6). Consequently, the total value of the flu shot was $30, not including the value of the physical bill or the "trade" of currency, explained in more detail below. In other words, a $10 out-of-pocket medical expense would be reported to the IRS as a $30 expense, leaving a tremendous, and still unexplained gap of over $7.9 million in the Plaintiffs' reported medical and dental expenses.

Third, to drill down on Mr. Quinones's understanding of "intangibles" and his valuation of goods, the Court used another hypothetical involving a $5 package of chocolate chip cookies. (Tr., 78:11–82:21). According to Mr. Quinones, the intangibles attached to the purchase of a $5 package of cookies are "goodwill and going concern." (*Id.*, 78:22–24). The goodwill accrues because "it is legal to own a property or the cookies in the United States." (*Id.*, 79:2–10). Hence, add $5 for goodwill, because the cost of the cookies is $5. (*Id.*, 80:12–23). Then, the "going concern value of the property" is another $5, because the cookie "functions the way it is used to function." (*Id.*, 80:1–13). At this juncture, the $5 package of cookies is actually valued at $15. (*Id.*, 80:13–18 (The Court: "On your tax returns, your theory was, I can also deduct $5 for the goodwill value of the cookie and I can deduct an additional $5 because of the going concern of the cookie company?" Mr. Quinones: "That's correct, Your Honor." The Court: "So for every $5 you spent for cookies, you believe the Internal Revenue Service should allow you to claim an additional $10 in loss. Is that right?" Mr. Quinones: Correct, Your Honor."), 88:12–17).

Perhaps most confoundingly, Mr. Quinones also valued physical receipts. (Tr., 91:2–12). He provided an example:

4

> Mr. Quinones: So, for example, in the cookie example, Your Honor, whenever you buy a cookie, you – you receive a receipt . . . . So that receipt shows the value of the item.
>
> The Court: It shows what you paid.
>
> Mr. Quinones: Yes, Your Honor. So I valued that –
>
> The Court: You valued the receipt?
>
> Mr. Quinones: Yeah, the receipt on my financial statement.
>
> The Court: So separate from the value of the cookie.
>
> Mr. Quinones: Correct, Your Honor.
>
> The Court: Separate from the value of the goodwill, separate from ongoing concern, you valued that paper receipt?
>
> Mr. Quinones: Correct, Your Honor.
>
> The Court: How much did you value that paper receipt at?
>
> Mr. Quinones: Well, since it shows the value and the cost and the list of the – the items being purchased, or traded, then I valued it . . . as the same as the $5 value.
>
> [. . .]
>
> The Court: So if your grocery list the day that you bought the cookies cost you $200, the receipt, the paper receipt itself . . . also had a value of $200?
>
> Mr. Quinones: Yes, Your Honor, because if without the receipt you cannot prove that you purchased the $200, so you cannot claim expenses if you do not have the receipts.

(Tr., 91:14–93:4).

Therefore, the earlier hypothetical out-of-pocket cost of the $10 (or $30 in the Plaintiffs' valuation methodology) flu shot is steadily increased up to a total of $180 since it involves valuing separately the cost of receipt for payment and the additional intangible cost of the $10 United States currency used to pay for the vaccine. (Tr., 107:21–108:19, 110:4–111:7). Still, a long way from reaching the nearly $7.9 million claimed as medical and dental expenses.

Mr. Quinones's calculation of "intangibles" did not end here; he then inexplicably multiplied the *value* of the medical and dental expenses by fifty-four (54), "to calculate the total amount, including the intangibles included on the services that I received." (Tr., 42:21–53:6). Mr. Quinones stated:

5

> So here, I have broken it down, because when you pay your medical provider, it's not only the services that you receive that you need to value, you're also paying for the workforce, the know-how of the doctor or service provider, and also attached to those services are goodwill and going concern value of those property [sic]. So those are the trade intangibles that I have added there.

(Tr., 52:21–53:6). Why a multiplier of 54? The Court does not know. It is easier now, however, to comprehend the final destination that produced the fantastical numbers of the Quinones' claim.

## II.   Conclusions of Law

The Special Plea in Fraud statute, 28 U.S.C. § 2514, provides:

> A claim against the United States shall be forfeited to the United States by any person who corruptly practices or attempts to practice any fraud against the United States in the proof, statement, establishment, or allowance thereof. In such cases the United States Court of Federal Claims shall specifically find such fraud or attempt and render judgment of forfeiture.

28 U.S.C. § 2514. In pursuing a Special Plea in Fraud claim, "the government bears the burden of proving that the claimant (1) knew the claim was false and (2) intended to deceive the government by submitting it." *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1042 (Fed. Cir. 1994) (citation omitted). The statue is intentionally broad, requiring forfeiture of any claim *affected* by fraud. *See Veridyne Corp. v. United States*, 83 Fed. Cl. 575, 586–87 (2008); *see also Kamen Soap Prods. Co. v. United States*, 124 F. Supp. 608, 620 (Ct. Cl. 1954) ("this statute goes further than merely banning fraudulent claims. It provides for a forfeiture of the claim if any fraud is practiced or attempted to be practiced in proving, establishing or allowing a claim.").

If fraud is established, "the judgment of forfeiture [is] obligatory on the court; the court has no discretion to turn a blind eye to an attempt, whether successful or not, to commit fraud in the statement of a claim against the United States." *Haddad v. United States*, 152 Fed. Cl. 1, 9 (2021) (quoting *Oasis Int'l Waters, Inc. v. United States*, 134 Fed. Cl. 405, 429 (2016) (citation omitted)). "In the context of tax refund suits, [the Court of Federal Claims] has referred to [28 U.S.C. § 2514] as a 'silver bullet' holding that even any '*attempted* fraud against the United States' is sufficient to cause forfeiture of the entire suit." *Heger v. United States*, 112 Fed. Cl. 224, 229 (2013) (citing *Farkas v. United States*, 57 Fed. Cl. 134, 146 (2003) (emphasis in original)).

To prevail under 28 U.S.C § 2514, the United States must show fraud "by clear and convincing evidence, which can be demonstrated by 'placing the questioned documents and statements alongside well-known and established facts.'" *Heger*, 112 Fed. Cl. at 229 (citing *Kamen Soap*, 124 F. Supp. at 620). "'Mere negligence, inconsistency, or discrepancies are not actionable' under 28 U.S.C. § 2514." *Haddad*, 152 Fed. Cl. at 9 (citing *Oasis Int'l Waters,* 134 Fed. Cl. at 428). Plaintiffs can, of course, rebut claims of fraud. To carry that burden, the claimant must "place in the ultimate factfinder an abiding conviction that the truth of its factual

contentions [is] 'highly probable.'" *State of Florida v. State of Georgia*, 141 S. Ct. 1175, 1180 (2021) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

The United States convincingly met its burden; in contrast, the Plaintiffs' efforts to convince the Court of the legitimacy of their wildly inflated tax return inputs failed. Short of saying out loud the sentence "I intended to defraud the United States," Mr. and Mrs. Quinones, the only two witnesses at trial, supplied every possible piece of evidence necessary to find fraud. The United States has met its burden under 28 U.S.C. § 2514 to establish by clear and convincing evidence that the Plaintiffs knew their claims were false and that Mr. and Mrs. Quinones intended to defraud the United States government. *See Young-Montenay, Inc.*, 15 F.3d at 1042.

Mrs. Quinones stated that her 2021 W-2 from Vistra Corp., (JX 7), accurately reflected her wages, 401(k) contributions, and income tax withholdings for the 2021 tax year. (Tr., 17:15–20:8). Her 2021 Form 1040 that she submitted to the IRS reflects numbers that in no way remotely resemble the numbers on her 2021 W-2 Form. (*See* Tr., 22:3–25:3). Similarly, Mr. Quinones stated that the numbers in his 2021 W-2 Form received from Fur Systems reflected reality. (Tr., 45:8–46:2; JX 8). However, his 2021 Form 1040 that he submitted to the IRS contains entirely imaginary numbers. (JX 9). The United States has, without a doubt, established that the Plaintiffs knew that the numbers they submitted to the IRS were false. This does not even include the completely fabricated medical and dental expenses, gifts, entertaining expenses, pet expenses, and more that the Mr. and Mrs. Quinones also included in their joint tax return. Following trial on this narrow issue, the Court found that the Plaintiffs had violated 28 U.S.C. § 2514, and that their "claim was false or misleading, and was intended to deceive the United States at the time that it was submitted." (*See* Tr., 128:8–17). This Opinion commemorates that ruling.

### III.     Decision and Order of Judgment

By using their false 2021 joint tax return as the basis for their claim, the Plaintiffs not only attempted to commit fraud against the IRS, but against this Court. No cogent explanation has been offered for the massive incongruities between actual income and withholdings, and the audacious sums presented to the IRS and the Court. The Court **FINDS** and **CONCLUDES** as follows:

(1) With support from clear and convincing evidence, that the Plaintiffs submitted a fraudulent joint tax return (Form 1040) to the IRS for the 2021 tax year.

(2) All of the Plaintiffs' claims in their Complaint are **FORFEITED** pursuant to 28 U.S.C. § 2514.

(3) Pursuant to RCFC 54(b), there being no just reason for delay, the Clerk is **DIRECTED** to enter judgment against the Plaintiffs.

Further proceedings are required to address the United States' counterclaim. The Court has already issued a Scheduling Order pursuant to that claim. (ECF No. 46).

**IT IS SO ORDERED.**



*David A. Tapp*
DAVID A. TAPP, Judge